QUEMAHONING COAL CO. v. MARYLAND COAL & COKE CO.

(Circuit Court of Appeals, Fourth Circuit. November 4, 1909.)

No. 886.

SALES (§ 417*)—ACTION BY BUYER FOR FAILURE TO DELIVER—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* to support a finding that defendant was liable for breach of a contract to deliver coal, as against a defense that it had the right to prorate delivery with other contracts; there being no provision to that effect in the contract, and it being shown that it delivered on contracts subsequently made at a higher price.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1173; Dec. Dig. § 417.*]

In Error to the Circuit Court of the United States for the District of Maryland, at Baltimore.

Action by the Maryland Coal & Coke Company against the Quemahoning Coal Company. From the judgment, defendant brings error. Affirmed.

See, also, 176 Fed. 303.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Ernest O. Kooser and Frederick Dallam (Ogle Marbury and Edmund E. Kiernan, on the brief), for plaintiff in error.

Frank Gosnell and Carroll T. Bond (Charles F. Uhl, Jr., on the brief), for defendant in error.

Before PRITCHARD, Circuit Judge, and KELLER and McDOWELL, District Judges.

PER CURIAM. This was a cross writ of error sued out by Quemahoning Coal Company, defendant below, from the same judgment to review which Maryland Coal & Coke Company sued out a writ of error in No. 885 (176 Fed. 303), and as the essential facts in regard to the origin of the litigation are recited at some length in our opinion in that case it will be unnecessary to restate them here.

The case was tried by the court in lieu of a jury by agreement of counsel, and the court, while its general judgment was in favor of the defendant below (plaintiff in error here), found damages in favor of the plaintiff below in a sum equal to two cents per ton for all the coal not furnished by plaintiff in error under a contract which reads as follows:

"Quemahoning Mines, Ralphton, Pa.

"D. B. Zimmerman, President.

"(Quemahoning Coal the Best Steam Coal.)

"Quotations subject to change without notice, and deliveries subject to car supply, strikes, accidents, and any other causes beyond our control.

"Railroad weights govern all sales.

"Quemahoning Coal Company.

"Miners and Shippers of Bituminous Coal.

"Offices: Somerset, Pa., Aug. 5, 1905.

"Maryland Coal & Coke Co., Baltimore, Md.—Dear Sirs: In reply to your letter, I will agree to furnish three hundred tons coal per day from our Quemahoning mines at $1.00½ f. o. b. cars at the mines. This coal must all apply to the Maryland Steel Co. upon their contract. This contract to run one year from this date. You people to furnish the Maryland Steel Co. cars at times when I am short on B. & O. cars or my own equipment.

"Yours truly,                                                D. B. Zimmerman.

"Aug. 5, 1905. Accepted.

"Maryland Coal & Coke Co.,

"By Geo. P. Spates, V. P.

"We get $1.02½ from Md. Steel Co."

We do not regard it necessary to notice separately all the assignments of error. The first is based on the refusal of the court to hold that the Quemahoning Coal Company had a right to substitute deliveries of coal from the mines of the Valley Coal & Stone Company in lieu of coal from its own mines in filling the contract in suit. The terms of that contract are so plain and absolute that there is no possible merit in this contention, and, it may be further noted, the substitution of this coal was only objected to after the consignee, Maryland Steel Company, had found and reported that the coal delivered from the mines of the Valley Coal & Stone Company was inferior in quality to the Quemahoning product.

The gist of the remaining assignments of error was to the effect

that, inasmuch as the plaintiff in error had other contracts, and was unable to fill them all, it was entitled to prorate its deliveries upon all of its contracts. We think an inspection of the record is all that is necessary to refute the bona fides of this claim. Such inspection will show that, subsequent to the date of the contract in suit (which provided for deliveries of 300 tons per day), the plaintiff in error took additional contracts (at higher prices) conservatively aggregating over 1,000 tons per day, besides having other contracts contemporaneous with, or earlier in date than, the contract in suit, amounting to over 500 tons per day. It is possible that some of these earlier contracts had expired before the additional contracts were taken, but it is certain that these subsequent contracts were taken without regard to that good faith which the contractual relations already entered into with the defendant in error demanded of plaintiff in error.

The court found as a fact, and we conclude was justified in finding, that plaintiff in error was not prevented by any interruption of car supply, strikes or combinations of miners or laborers, or accidents in the mines, or any other cause beyond its control, from delivering the full amount of coal called for by the contract in suit, and found that the amount undelivered was applied to other contracts, subsequently taken, and at a higher price. The evidence shows that, as a rule, so far from there being a shortage of cars, there was an abundance of cars on hand, and it further shows that the plaintiff in error, as early as November 28, 1905, directed defendant in error to cease delivering empty cars of the Maryland Steel Company (the consignee under the contract in suit), and refused to load any more of them for the present. In addition to this the record shows that on only 80 days in the entire contract year did the plaintiff in error load all of the available cars on hand, and that of these days 44 occurred in the period prior to December 1, 1905, up to which date no shortage in deliveries was experienced under the contract in suit. In fact, it was in months when the car supply was most abundant and the shipments greatest that deliveries under this contract were the least. On only one day, viz., July 14, 1906, did the plaintiff in error ship an amount of coal equal to the daily deliveries contracted for with defendant in error and with parties with whom subsequent contracts were made. On that date it shipped 1,582.9 tons, and in the entire month of July, 1906, 21,868.4 tons, and it is significant, upon the question of the good faith of the claim of plaintiff in error that it did not willfully violate this contract, that of this monthly shipment, the largest in its history, but 89 tons were delivered under the contract in suit.

It seems to us that the true state of affairs in regard to these deliveries in the spring and summer of 1906 (when the main part of the shortage occurred) is plainly indicated by provisions inserted in some of the subsequent contracts entered into by the plaintiff in error, at prices higher than that stipulated in the contract in suit. Thus, in the contract (Plaintiff's Exhibit FF) made April 11, 1906, between plaintiff in error and Barnes & Tucker Company, for 40,000 tons of coal to be delivered at the rate of 3,333 tons per calendar month at $1.25 per ton, it was agreed that:

"If the said Quemahoning Coal Company fails to deliver in equal monthly shipments 3,333 tons of coal per month, as above stated, the said Barnes & Tucker Company have the privilege of going into the open market and buying coal of satisfactory quality, to an extent corresponding to shortage in Quemahoning Coal Company's shipments, and charging to the said Quemahoning Coal Company the difference between the price hereinabove agreed upon and the price they are compelled to pay in open market."

There is nothing in that contract looking to a right to prorate any shortage in deliveries; but, on the contrary, such a right or custom is expressly negatived.

It is unnecessary and useless to analyze the evidence further. We are fully convinced that the learned judge below was abundantly justified in his fifth and sixth findings of fact (page 19, record), and in his first, second, and fourth conclusions of law (pages 21 and 22, record), and we therefore affirm the judgment entered by the Circuit Court, so far as concerns the matters raised by this cross writ of error, with costs.

Affirmed.